# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 28, 2018

## STATE OF TENNESSEE v. DAVID LYNN ZEIGLER

**Appeal from the Circuit Court for Maury County**
No. 22891     Russell Parkes, Judge

_____

### No. M2017-01091-CCA-R3-CD

_____

The Defendant-Appellant, David Lynn Zeigler, appeals from a Maury County jury conviction of rape by "knowing or having reason to know [the victim] was mentally defective, mentally incapacitated or physically helpless." Tenn. Code Ann. § 39-13-503(a)(3). In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the trial court erred in prohibiting trial counsel's cross-examination of an expert witness about his suspension from the practice of forensic psychology for unprofessional conduct; (2) whether the trial court's decision to limit cross-examination of the expert witness effectively interfered with trial counsel's right to present a defense; and (3) whether the trial court imposed an excessive sentence. For the reasons that follow, we reverse the Defendant's conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Remanded for New Trial**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. TIMOTHY L. EASTER, J., filed a separate dissenting opinion.

Samuel Patterson (at trial), Columbia, Tennessee, and Larry D. Drolsum and Teresa D. Smith (on appeal), Brentwood, Tennessee, for the Defendant-Appellant, David Lynn Zeigler.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 10, 2012, the victim, an adult female, engaged in oral sex with the Defendant in his car. When the victim's mother discovered the incident some months later, she reported it to the police. Although the victim professed her love for the Defendant and maintained that she was not forced to engage in sex with him, the Defendant was subsequently indicted for rape. There was no dispute that the Defendant had sex with the adult victim at trial. The sole question before the jury was whether the victim, who had been previously diagnosed with Williams Syndrome, met the definition of "mentally defective" and was therefore competent to consent.[1] Crucial to the resolution of this question was expert testimony to aid the jury in understanding Williams Syndrome, a rare genetic disorder which causes developmental and learning disabilities. Under these circumstances, a classic battle of the experts ensued.

Prior to trial, defense counsel sent the State by facsimile documents with which they intended to impeach the State's expert witness, Dr. James Walker. In response, on March 23, 2016, the State filed a motion in limine seeking to exclude the same. Specifically, the State objected to referencing a consent order entered by a professional board, which had suspended their expert's license. The State argued, based on Rules 402 and 403, that the evidence did not make any material fact more or less likely, and that even if relevant, the probative value was substantially outweighed by the danger of unfair prejudice.

At the March 30, 2016 hearing on the motion in limine, Dr. Walker, a neuropsychologist, testified that he was required to maintain a license by the Tennessee Board of Psychology. He was asked by the State to perform an evaluation on the victim in this case, which was completed on July 21, 2015. He conceded that he had signed a consent order from the Department of Health in 2013. Dr. Walker testified regarding the circumstances of the consent order, which stemmed from a prior substance abuse problem. He received treatment in February 2013, and he had not abused drugs since then. He said he was currently in recovery and did not use any "mind-altering substances." The consent order specifically cited Dr. Walker for engaging in "unprofessional, dishonorable, or unethical conduct." Dr. Walker testified that he was never impaired while at work or while practicing. Dr. Walker further testified that as part of the consent order, he was required to be on probation for five years or until 2018. The Board of Psychology also retroactively suspended Dr. Walker's license to the period when he was in rehabilitation; however, it was reinstated immediately upon Dr. Walker's release.

---

[1] "Mentally defective" means that a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of appraising the nature of the person's conduct. Tenn. Code Ann. § 39-13-501(3).

- 2 -

On cross-examination, during an exchange regarding Dr. Walker's prior testimony as an expert in other criminal trials, Dr. Walker testified that Judge Monte Watkins had on two occasions permitted a jury to hear about his "disciplinary issues." He specifically testified that the State was permitted to cross-examine him about his prior discipline, the probationary status of his license, and the fact that his license had been suspended for substance abuse. Dr. Walker reiterated that he had testified as an expert in 34 cases since December 2012. He acknowledged that in 20 of those cases the disciplinary issue was not raised, which left 14 remaining cases. Asked if there was any other criminal case during which the issue was raised but the parties prohibited from discussing, Dr. Walker cited a federal case. He explained that the judge limited the questions, which were outside the presence of the jury, to (1) whether he was intoxicated at the time of the evaluation and (2) whether he was intoxicated at the time of his testimony. Dr. Walker testified, however, that in the federal case he did not provide testimony before the jury.

At the close of proof, the trial court asked the parties to confine their argument to two issues (1) whether the Court should allow a question as to whether Dr. Walker's license is presenting in probated status; and (2) whether the Court should allow for specific inquiries as to the facts underlying the reason for the probation.

The State argued, at length, that the specific instances of conduct, i.e. the drug abuse, the consent order, and the probationary status of Dr. Walker's license, did not reflect on the truthfulness of Dr. Walker's testimony and was therefore barred by Rules 608 and 609 of the Rules of Evidence. The State maintained that the minimal probative value of this evidence was outweighed by its unfair prejudicial effect. The State conceded that whether Dr. Walker's license was in probationary status was a separate question. The State reasoned, while this evidence may be relevant under Rule 402, under Rule 403, its probative value was outweighed by its unfair prejudicial effect "perhaps less so than in the specific instances analysis." The State buttressed its argument by noting that the Board did not completely deprive Dr. Walker from practice, the "attenuation" of time between the events underlying the consent order and his evaluation of the victim, and that Dr. Walker was no longer using any "mind-altering substances." For these reasons, the State argued, on relevance grounds, that any reference to the current status of Dr. Walker's license should be excluded.

After an exhaustive exchange between defense counsel and the trial court regarding Rule 608, the specific instances of conduct underlying the disciplinary action, the trial court asked defense counsel to narrow his argument. The trial court inquired "if I exclude the specific instances of conduct under 608 and I allow you to say, [']Is your license or are you on probation right now.['] How does that . . . not mislead of confuse the jury or leave them left to speculate as to why?" Defense counsel responded by noting that the State chose this witness as their expert. While it may confuse the jury to some degree, it would be fundamentally unfair to allow the State to bolster their expert with his credentials and simultaneously preclude the Defendant from asking about the status of his

license. Defense counsel argued that in granting the State's motion, the trial court would allow the State to present a "false impression" of their expert, whose license had been suspended and was in probationary status at the time of the evaluation in this case. In closing, defense counsel pleaded with the court to allow him to "go in to at least [Dr. Walker's] suspension and reinstatement and his probation, license being on probation. And to ask a further question about being suspended based on that specific code section."

In granting the State's motion, the trial court filed a detailed written order and reasoned as follows:[2]

> The Court must make at least three (3) separate analyses in order to make its determination, which consist of: a) whether to allow counsel for Defendant to inquire as to Dr. Walker's current licensure status with the Tennessee Board of Psychology and whether or not his license to practice psychology is currently in probation status; b) whether to allow not only the aforementioned evidence, but also to allow questions as to the specific instances of Dr. Walker's conduct that led to the entry of the Consent Decree and the professional discipline described therein; or 3) [sic] whether to exclude the testimony in its entirety.
>
> With regard to evidence regarding the Consent Decree and all of the matters described therein, the Court finds:
>
>> a) While there is no dispute that the behaviors described in the Consent Decree and those testified to by Dr. Walker occurred within the last ten (10) years, there is no evidence to suggest that the behaviors in question are relevant to Dr. Walker's truthfulness or lack thereof, as required under Rule 608(b).
>>
>> b) The probative value of said testimony does not substantially outweigh its prejudicial effect. Therefore, in accordance with Rule 608(b), testimony about the specific instances of Dr. Walker's conduct that led to the entry of the Consent Decree should not be permitted.
>>
>> c) Since Dr. Walker is a licensed professional, questions regarding his professionalism are relevant under Rule 402, and are thus not excluded based on a lack of relevance.

---

[2] The trial court also provided oral findings of fact and conclusions of law at the close of the hearing. As they are consistent with the trial court's order, it is unnecessary to include in the facts of the opinion.

- 4 -

However, under Rule 403, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

d) Allowing counsel for the Defendant to ask Dr. Walker whether his license to practice psychology is in a probation status, or whether he was professionally disciplined for "unprofessional, dishonorable or unethical conduct[,]" as described in the Consent Decree as a direct quotation from T.C.A. §66-63-11-215(b)(1) [sic], with no more explanation or definitions provided to the jury, carries with it a considerable danger of unfair prejudice, and of confusing or misleading the jury.

e) As Dr. Walker testified that his issues that led to the entry of the Consent Decree were not in existence either at the time that Dr. Walker performed his evaluation of the alleged victim herein or at the current time, and the Court accredits that testimony, the probative value of the testimony cannot be considered to be significant, and is substantially outweighed by the danger of unfair prejudice.

The Court has already held herein that the specific instances of Dr. Walker's conduct may not be introduced or inquired into, under Tn. R. Ev. 608(b). Beyond that, the Court further holds that the status of Dr. Walker's licensure and the probation imposed upon his license to practice psychology may not be introduced or inquired into, under Tn. R. Ev. 403.

**Trial.**[3] Cherylyn MacPherson, a detective with the Columbia Police Department, was assigned this case, read over the initial May 20, 2013 report taken by a patrol officer, and contacted the victim's mother, the reporting party, on June 3, 2013. A forensic interview of the victim was completed on June 25, 2013, prior to Detective MacPherson's interview with the Defendant on July 19, 2013. The Defendant waived his Miranda rights and told Detective MacPherson that he was the victim's pastor and that he had known her since she was thirteen years old. He said that her family came to his church, and he became a mentor to the victim. He said he knew the victim had a "crush" on him. He also explained how their relationship evolved "from a crush to when [the victim] became 18-years old to a sexual relationship[.]" Asked if the Defendant knew whether

---

[3] Although the issues presented do not require a full recitation of the proof at trial, we include them for purposes of the harmless error analysis later discussed in this opinion and in the event of further appellate review.

- 5 -

the victim had any "limitations," Detective MacPherson recalled the Defendant to reply as follows:

> [The Defendant] explained to me that during their initial meeting when she was – when [the victim] was 13 and the mother, [victim's mother] had explained to him that [the victim] had something. He said he couldn't remember what it was until about [May 2013], he had heard it again.

> [The Defendant] said . . . . "I thought it was something physical, like a physical limitation, because her mother had some physical issues."

Detective MacPherson later met the victim and did not observe her to have any physical limitations. The Defendant told Detective MacPherson that on October 10, 2012, the victim performed oral sex on him while in his car. The Defendant also told Detective MacPherson that the victim was a "sweet girl" who was "into music" and "slow." Asked what he meant by "slow," the Defendant said that she was "behind a grade." The Defendant was specifically asked whether he knew if the victim had any mental limitations to which he replied, "No." Detective MacPherson told the Defendant that the victim had an IQ of 69 and was considered "mentally retarded." Asked if that surprised him, the Defendant initially replied no but later clarified, "Yes, it did surprise him."

Asked if he and the victim had discussed any future life plans, the Defendant told Detective MacPherson that the victim "wanted to marry him and have babies with him." He said the victim "knew what she was doing and that she wanted a baby and was even knitting a baby blanket . . . he never asked her to have a baby and she pursued him and . . . that's what she wanted." As part of her investigation, Detective MacPherson also interviewed Brian Hunt, a deacon at the church the victim and the Defendant had attended. Detective MacPherson confirmed that the offense occurred in Maury County, Tennessee.

On cross-examination, Detective MacPherson confirmed that her husband was the patrol officer who took the initial report in this case. She further acknowledged that as part of her investigation, she had to determine whether the victim was competent to provide consent for sexual intercourse. Finally, she confirmed that the victim was an adult at the time of the alleged offense by providing her birthday. She confirmed that the Defendant told her he tried to "break off" his affair with the victim because it was "a sin and wrong." However, the victim continued to pursue him. The Defendant also told her that the victim's mother "had mentioned something in passing years ago [regarding the victim's mental limitations] but he didn't know what was said or what it was." She further confirmed that the Defendant advised her that the victim's mother also told him

about the victim's mental limitations after the alleged offense. Finally, she confirmed that the Defendant did not have a prior criminal history.

Susan Pruitt, a licensed psychological examiner for over 15 years, administered and interpreted psychological tests including intelligence quotient (IQ) tests and Minnesota Multiphasic Personality Inventories (MMPI's). She worked at Tennessee Career Center during the day and Columbia Counseling at night. She testified and described the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS). She said it provided an overall IQ and was broken down into four categories including verbal comprehension, perception reasoning, working memory, and processing speed. She explained that in order to determine if an individual met the State standards for an intellectual disability[4] she would also need to perform an adaptive behavior evaluation, which measures whether an individual could perform basic needs such as living alone, feeding themselves, counting money, or driving. She later confirmed that she did not administer an adaptive behavior evaluation on the victim.

On June 3, 2013, Pruitt administered a psychoeducational exam and administered "the Wex IV" on the victim, who was 19 years old. She explained that the victim was referred to her from someone at her church and described as "a homeschooled child that needed an updated evaluation and, you know, money was an issue and could I do it." Per her evaluation, the victim was in the "low average range" for verbal comprehension, "scored a 75" or was "borderline" for perceptual reasoning, was in the "extremely low category" for working memory, and in the "extremely low" range for processing speed. Based on these scores, Pruitt considered the victim's general cognitive ability or full-scale IQ to be in the extremely low range. Her composite score was 69 and the composite interval was 66 to 73. Pruitt did not believe that the victim's full-scale IQ was equivalent to her chronological age. A copy of her report was admitted into evidence.

On cross-examination, she confirmed that the victim's mother sought out testing to "set realistic career and employment goals" for the victim. Pruitt did not know that the test was going to be used to determine if the victim was competent to provide consent for sexual intercourse. She did not review any of the victim's prior medical records. She confirmed that IQ tests alone cannot determine whether an individual met the State standard for intellectual disability, and that she needed to have performed the adaptive behavior test for that determination. She further confirmed that her evaluation was performed for psychoeducational purposes only.

Doctor Mary Cox, a licensed psychologist practicing in Columbia, Tennessee for over 20 years, was tendered as an expert in the area of psychology. Dr. Cox first treated

---

[4] To the extent possible, we have replaced the phrase "mentally retarded," as used by many of the witnesses in this case, with the preferred phrase "intellectually disabled." See Tenn. Code Ann. § 33-1-101(16)(C) (Supp. 2010); Coleman v. State, 341 S.W.3d 221, 226 n.5 (Tenn. 2011).

the victim when she was "eight or nine" years old for purposes of resolving a child custody or visitation matter. She explained that the victim's mother and father were divorced, and the victim's biological father had allowed the victim to enter a public restroom alone. Following this incident, the victim's mother had the victim evaluated for the purpose of determining if "she had the capacity to be able to be unsupervised in [a public bathroom]." Dr. Cox determined that the victim was not capable of entering a public bathroom alone. She explained that during her initial treatment of the victim, she was made aware that she had been previously diagnosed with Williams Syndrome; however, she was unfamiliar with the condition. In fact, she had never had a case of Williams Syndrome and had a limited understanding of the condition.

After appearing in court in the visitation/child custody matter, Dr. Cox did not treat the victim again "for years." In May 2013, the victim and her mother "came in together" to see Dr. Cox. Dr. Cox testified that the victim had been having a relationship with an older man and "the mother was concerned about what had happened and what she had been through and that kind of thing." Dr. Cox treated the victim for the purpose of the "after affects" of her relationship with the Defendant. Dr. Cox explained that she treated the victim in the presence of her mother, which was at the victim's request. Dr. Cox observed that the victim's mental age was that of an "8 or 9 year old child." Dr. Cox did not perform any intellectual testing on the victim.

Dr. Cox testified that the victim "can be very verbal, very mature talking, very friendly, very social. She's also very talented musically, as well as with art." Asked if one could have a short conversation with the victim without realizing that she had any mental disability, Dr. Cox replied, "It's possible, yah, just in a brief, yeah, meeting." She said the victim was "more naïve, trusting, accepting things at face value, not having any ability to ascertain maybe underlying intent or anybody that would be being false with her." She stressed her belief that the victim would not be able to perform academically at her chronological age.

In regard to the Defendant, the victim told Dr. Cox that she met him at church and, as a child, had a crush on him. Dr. Cox did not consider the victim's crush on the Defendant to be "a-typical." Dr. Cox discussed the "ramifications of her affections for a man who was otherwise married" with the victim. Dr. Cox said the victim believed the Defendant would "divorce his wife or else when his wife passed away, then they would be able to be together." Dr. Cox said the victim had "tunnel vision" about the situation and believed that she and the Defendant were going to be together. She confirmed that the victim made a baby blanket because she believed she and the Defendant were going to have a baby together. Dr. Cox characterized the victim's thoughts as "[j]ust kind of fantasy." Dr. Cox said that the victim had an anniversary date memorializing her relationship with the Defendant, and previously had set up a table for an anniversary dinner. Ultimately, Dr. Cox opined that the victim could not "appraise the nature of her own conduct with regard to sexual behavior." In her view, the victim was unable to

provide consent for sexual activity. Dr. Cox's conclusions were memorialized in a letter which was admitted into evidence at trial.

On cross-examination, Dr. Cox was asked if she agreed that Williams Syndrome was caused by missing genes on chromosome seven. In response, she said, "It's an abnormality of that. That's not my specialty or field." She believed she may have reviewed the victim's medical records from Vanderbilt when she first evaluated her for the custody matter. However, Dr. Cox did not review any medical records for her treatment of the victim pertaining to this case. Asked if she had relied on any other testing in arriving at her conclusion, Dr. Cox said that she "knew that IQ testing had been consistent with what [her] clinical opinion was." Asked if the victim was more open during counseling sessions without her mother, Dr. Cox replied,

I don't think I can really say. That would be true not the crush part or the love part, but anything that was beyond that she would have been a little more open without her mother in the room.

Dr. Cox agreed that the victim's verbal IQ was higher than her overall IQ. As relevant to the victim's ability to understand and consent to sex, the following exchange occurred between defense counsel and Dr. Cox:

Q: [The victim] understands . . . what sex is, does she not?

A: Correct.

Q: She understands sex, what sexual intercourse or oral sex is, isn't that correct? She understands that?

A: I think –

Q: The act of it?

A: -- some of that learning though happened after this began.

Q: Okay. Do you know that for certain? Can you state with a degree of medical certainty?

A: Well, she told me that she got on the internet and looked stuff up that had been talked about to her.

. . . .

Q: She knew that she was having an affair with [the Defendant]?

- 9 -

A:  No.  It was not an affair in her mind.

Q:  Okay.

A:  It was a love relationship forever and ever.

Q:  She loves [the Defendant]?

A:  Yes.

Dr. Cox confirmed that the victim told her (1) that the Defendant did not force her to engage in oral sex; (2) that she agreed to sex with the Defendant; and (3) that she provided consent to sex.  Although Dr. Cox acknowledged the YAI Verbal Inform Consent Tool and Social Sexual Awareness Scale, both tests a psychologist can give to an individual to determine their understanding and ability to consent to sex, she was unfamiliar with them and did not use them to evaluate the victim.

Brian Hunt testified that from 2001 to 2009, he had been a member of the same church the victim and the Defendant attended.  He confirmed that the Defendant was a pastor at the church and, over time, Hunt had become an ordained elder and vice chairman of the board of directors.  The victim and her mother were in Hunt's shepherd group.  As far as the victim's physical ability, Hunt said that she was a thin girl and "a little bit more naïve to say the least."  He was not aware of any specific mental disability of the victim, but he knew there was some "incapacitation" there.

Asked if Hunt had a discussion with the Defendant about the victim, Hunt said the Defendant had specifically asked to discuss the victim's affection toward the Defendant with him.  The Defendant had told Hunt that he had received a letter from the victim, and Hunt and the Defendant discussed the letter.  Hunt advised the Defendant to "create a little bit of separation" between he and the victim.  Hunt said the Defendant received the advice "well," was confident he could handle the situation, and intended to speak with another church elder.  Hunt testified that there was no discussion about the victim's mental disability or limitation during his meeting with the Defendant.  Hunt said the Defendant never indicated an awareness that the victim might be "different" than the other children at the church.  Hunt said this conversation occurred before the victim became an adult.  Asked if he would advise the Defendant to create space between he and the victim had the victim been 10 years older, Hunt explained that he would because he would give that advice to any married man in that situation.

The victim's mother testified that she and her daughter lived together in Columbia, Tennessee.  The victim's mother said she had five children, all of whom no longer lived at home, except the victim.  The victim's mother did not work outside the home.  She explained that when the victim was born, she was "not breathing and they had to call

Code Blue on her, but she started breathing and she was okay." The victim's mother became familiar with Williams Syndrome after she had taken the victim to be evaluated by a geneticist when she was eight or nine years old. She explained Williams Syndrome as follows:

> Well, it has to do with Chromosome 7 and it has to do with deletions that are on Chromosome 7. So, they initially tested her and they thought that perhaps she would have this full deletion, but it came back that the full deletion she didn't have. So then they tested her again and then it came back where there was [sic] some deletions, or this variation on Chromosome 7.

The victim's mother homeschooled all her children, and she said the victim's development was "quite different." She said she tried to follow the traditional home school curriculum, but the victim was unable to follow it. She said the victim could not retain things. However, the victim excelled in music, art, memory, and was "really, really nice." She explained that the victim could memorize virtually every episode of Gilligan's Island and the Walton's. She said the victim's verbal ability, while strong, was a symptom of Williams Syndrome. She said the victim was limited in math or anything to do with arithmetic. She said the victim does not have many friends her own age because they immediately know something is different about her. She said the victim likes being around adults because "they think she's sweet and nice."

The victim's mother confirmed that the victim had had two jobs outside the home. She worked on a dairy farm milking cows and cleaning stalls when she was in her late teens. The victim was paid by personal check; however, the dairy farm job ended because the victim's school work began to suffer when her employer needed her more than once a week. The victim's second job was as a greeter at the Farmer's Restaurant. She seated patrons, cleaned silverware, and provided drinks to customers. She held this job for a few months, and it ended because the victim was unable to work on Sundays. She said the victim had a savings account, but not a checking account. The victim's mother opened the savings account when she was young; however, the victim went to the bank with her mother and withdrew money from the account.

The victim's mother testified that the victim did not have a driver's license; however, the victim obtained her driver's permit when she was 18. She said the victim took the written portion of the driver's exam three times before she passed. She said after the victim received her permit, she was able to drive but not alone. She said the victim had not pursued her full license, and, at the time of trial, had not driven in more than two years.

According to the victim's mother, excluding the Defendant, the victim had never had a boyfriend. She met the Defendant through church, which they attended regularly

on Wednesday and Sunday. The victim's mother said that initially she was not aware of any special attention the victim gave to the Defendant. However, she said that "it started being noticeable and she would talk about him. And so she had a little crush on him. Everybody at the church knew that. His wife knew, he knew, that she kind of liked him. I had conversations with [the Defendant] regarding [the victim], and so, yeah, she had a crush on him." The victim's mother admitted that she was not bothered by the crush, initially.

The victim's mother testified that she told the Defendant about the victim's mental limitation three times: (1) during marital counseling following her second divorce, (2) at church during a conversation about how the victim was musically talented, and (3) when the Defendant and the victim were going to work on a fence and she told him if they stopped at a restaurant to use the bathroom, he had to walk the victim to the door and stand by the door until she came out. The victim's mother said she told him the victim was "special" and that he knew what she meant.

The victim's mother confirmed that the Defendant gave the victim a necklace for her 16th birthday, a box of chocolate after a trip to Pennsylvania, and some shirts he had picked out on another occasion. Around May 2013, the victim's mother became troubled with her daughter's relationship with the Defendant when the Defendant called her when his wife was out of town and asked if the victim could come to his home and help him prepare some things for church. When the victim's mother offered for all of them to come, the Defendant declined and said he only needed the victim to help. The victim's mother confronted the victim, who then told her mother that she no longer respected her because she did not allow her to go help the Defendant. The victim's mother became concerned, and shortly thereafter, called the Defendant and inquired about his relationship with her daughter. The Defendant initially denied anything inappropriate; however, he later admitted to having kissed the victim and holding hands with her.

After the victim's mother determined that that there had been inappropriate sexual contact between the victim and the Defendant, she consulted with Dr. Cox. She said she and her daughter attended counseling sessions with Dr. Cox two to three times a week. She also took the victim to be evaluated by Drs. Pruitt, Walker, and Brown. She confirmed that the victim celebrated a date as her anniversary with the Defendant and that she has celebrated that date as their anniversary every year since the discovery of their relationship by her mother.

On cross-examination, the victim's mother confirmed that the victim had previously obtained a driver's permit and that she was registered to vote. She generally acknowledged and confirmed the extent of her observations of the victim's behavior as testified to on direct examination. She further said that she did not believe she needed a conservatorship because she was the victim's mother.

The victim, age 22 at the time of trial, testified that she lived in Columbia, Tennessee with her mother. She confirmed that she had four siblings and that she had previously worked outside the home as a restaurant hostess and with a landscaping company. She described her hobbies as attending church, playing music, and writing songs. She further confirmed that she did Elvis impersonations and had a jump suit to do so. Although she did not know how to read music, she was a self-taught musician and could play the piano, guitar, mandolin banjo, and drums. When she wrote music, she wrote "love songs" which dealt mostly with the Defendant. She met the Defendant in 2008, when she was 14, while he was the pastor at her church. She initially viewed the Defendant as "weird" but eventually saw him "differently." She began to do activities outside of church, such as lawn work, with the Defendant in 2010, when she was 16. In 2008, she told the Defendant that she had a "crush on him." She said he told her "he was flattered and that I'd probably be married in about five years. And he said that him and I would just take it day by day. . . . [And] I didn't know what that meant because he didn't clarify."

In 2010, the victim gave the Defendant a compact disc of eight songs she had written as an expression of her romantic feelings toward him. At some point, the Defendant acknowledged that he had listened to the songs and told the victim that he loved his wife. The victim said, "And that was just kind of the end of that. Other than . . . but as far as really discouraging me then, no." She said her feelings toward the Defendant did not change. She confirmed that the Defendant had given her gifts: a silver, stainless steel necklace with a cross pendant for her 16th birthday and three turtleneck shirts for her 18th birthday. She said she was surprised to receive the gifts, and that by her 18th birthday the Defendant had not expressed any feelings toward her. She confirmed that she danced with the Defendant at a church party celebrating her 18th birthday.

After the victim turned 18, she "was kind of knowing that [the Defendant] was feeling something" for her. She said he began to flirt with her and recalled an occasion when she helped the Defendant take his briefcase upstairs. She said the Defendant turned to give her a "big hug and lifted me up off the ground and said, [']I just want you to know that I thank you for being you and I love you.[']" Asked if she understood the difference between a romantic and non-romantic situation, the victim replied, "Yes, sir." She then described the way the Defendant said I love you as non-romantic. She said her feelings for the Defendant "continued to grow."

After the Defendant's contract at the church in Columbia was not renewed, he began a church in his home, which the victim attended. The victim testified that she and the Defendant romantically kissed on October 5, 2012, which made her feel special. She said by that time she and the Defendant were "together" or "dating, in a relationship, not an affair." She acknowledged that the Defendant was still married but insisted that they were in a relationship "[b]ecause he said we were. We had already talked about getting

- 13 -

married and being together." She said they discussed "future plans" together including having a male baby because the Defendant had three girls and discussed places they wanted to visit. In court, the victim had with her a knitted baby blanket and drawings of her and the Defendant in a foreign country. She never told her mother about these conversations for fear her mother would "bash" the Defendant.

The victim said the Defendant told her that "for him and I to be able to get married, [his wife] would have to be passed away." The victim thought it might be possible to be with the Defendant while his wife was alive. The victim recalled another occasion when the Defendant was at her house and she was sitting on his lap. She recalled her head was "buried in [the Defendant's neck]" and she asked if they could be together. "And [the Defendant] said, I don't know. He said, I can't answer that right now. He said, You know, I made a promise to [Wife] a long time ago. He said, I have to keep that." Asked why she considered them to be in a "dating relationship" rather than an "affair," the victim said "I wasn't using him and I didn't think that he was using me at the time, and we were going to get married. He told me that we would eventually."

The victim testified that on October 10, 2012, the Defendant picked her up from her home to go and paint the home of another elder church member. The Defendant's oldest daughter was with them and helped them paint. When they finished painting, the Defendant dropped his daughter home, and then he and the victim parked on a road off of Bear Creek Pike, near his home. She said that they talked about "usual stuff" and that she told him "she loved him." She said he told her he loved her and that they kissed. She said, " . . . I was going to touch him down there and, you know, he unbuttoned him [sic] pants and everything and I was just touching him and everything and then I . . ." She said she was, "Just touching him and then I put it in my mouth and - - - I remember he said, Yeah, there you go. But – and then I just did that for a little bit and then nothing." She confirmed that "down there" meant penis, and that the Defendant pulled down his pants and underwear. Asked if the Defendant asked her to put "it" in her mouth, she replied, "No, but at first he ask me if I would kiss his penis for him." She said his penis was not erect and that it was in her mouth for "[p]robably a minute." She continued to spend time with the Defendant after this incident.

She said her mother discovered the incident on May 14, 2013. She confirmed that she was upset with her mother for not allowing her to go over to the Defendant's home to help clean. She said her mother repeatedly asked if the Defendant had touched her inappropriately, and she relented and said, "Why don't you ask [the Defendant?]" After her mother left, the victim called the Defendant to give him a "heads up" that her mother was going to call him.

The victim confirmed that she had been interviewed by Drs. Cox and Brown. She said that Dr. Brown had erroneously described her necklace as gold in her report. She confirmed that she was also evaluated by Dr. Walker, who administered certain tests that

Dr. Brown did not. She said she spent more time with Dr. Walker. She confirmed that she had never had a driver's license; but that she did have a driver's permit. She was excited to obtain her driver's permit, but she never drove alone. At the time of trial, the victim no longer had her permit. She explained that the time to renew it had lapsed.

At the close of her direct testimony, the victim said,

> It shouldn't have played out this way. I trusted in [the Defendant]. He told me even after all of this came out he wouldn't leave me. He did. He told me that he would stick up for me. Obviously, he hasn't still at this point.
>
> . . . .
>
> We were supposed to be together and [the Defendant] should have been a strong enough man to stand up and say [Wife], this is what happened and tell his daughters what happened. And he should've decided what he needed to do. He needed to act in a different manner. And he has been very cowardly and hiding behind people and lying and I'm very disappointed in him.

On cross-examination, the victim generally confirmed her direct testimony. She further stated that she had remained at home and took care of herself for three days while her mother was out of town. However, she spent the night during that time at her sister's house. She described how she cooked mashed potatoes, steak, and spaghetti. She said she cooks for herself every day, even when her mother is in town. Asked if she remembered saying that she did not want to be there for an interview but that her mother wanted her to be there, the victim replied,

> Because at that time things were still very fresh and I thought [the Defendant] was gonna be doing some things differently. And already people thought, you know, that he had used me and lied to me. And I said that because I didn't want people to get him mixed up with something that he wasn't.

Dr. James Walker testified as an expert in the fields of clinical neuropsychology and forensic psychology. He explained the difference between psychology and forensic psychology. He said psychology involved the study of human behavior while forensic psychology related to the legal system. He further explained that neuropsychology is the part of psychology that deals with brain functioning and brain disease, such as "developmental disorders like mental retardation or learning disorders." He, along with Dr. Karen Milliner, another psychologist, evaluated the victim. In doing so, he reviewed

reports provided to him by the prosecutor including Dr. Pruitt's report and a letter from Dr. Cox. He also interviewed the victim and her mother.

Dr. Walker explained that Williams Syndrome is a disease of the human brain, the human body actually. He explained that it is caused "by a child who has a particular set of genes on a chromosome missing, Chromosome Number 7." In his evaluation of the victim, he observed her to have several characteristics that were consistent with Williams Syndrome including a thin, elfin appearance, a heart problem, being gifted musically, and being obsessively focused on certain areas. He said that during the interview, the victim was "extremely pleasant," had good eye contact, and her thinking was "somewhat concrete."

Dr. Walker's report reflected that the victim was "pseudo-sophisticat[ed]," which meant that she "used big words she didn't understand." The example Dr. Walker used to illustrate his description was when he asked the victim for her social security number and she declined to give it to him. When he asked her why, the victim told him that a person should not give out their social security number. When he inquired as to the reason why, the victim could not provide an answer.

Dr. Walker performed several tests on the victim including the Mini Mental State Examination (MMSE), the Repeatable Battery For the Assessment of Neuropsychological Status (RBANS), Trail Making Test (TMT), the Booklet Category Test (BCT), the Lowenstein Functional Financial Assessment Scale (LFFAS), the Personality Assessment Inventory (PAI), the Gudjonsson Suggestibility Scale of Two (GSSII), the Gudjonsson Compliance Scale (GCS Form D), the YAI Verbal Informed Consent Tool (YAI), and the Social Sexual Awareness Scale (SSAS), the Vineland Adaptive Behavior Scale II (Vineland II) (given to the victim's mother).

Dr. Walker testified that the MMSE provided a "quick snapshot of what a person is and is not capable of from a mental point of view." The victim scored a 28 out of a possible 30 on this test, which required the victim to perform such tasks as serial subtraction, spelling words backwards, naming common objects, and writing out a grammatically correct sentence. On the RBANS, which samples the thinking and reasoning behavior of a person by asking them to learn new information, the victim scored 74 out of 100. According to Dr. Walker, "[t]he 70 level is the cutoff of a person who is really demented[,] who has very, very serious cognitive problems." The victim's score placed her approximately in the "4th percentile." The TMT, a test which measures "brain dysfunction" by exposing an individual to a "set of numbers, numbered dots on a page," the victim was "well within impaired limits" at "below low average." The victim also took the BCT, which determined her capacity for "higher order reasoning." The victim was shown puzzles and asked to make guesses on how the puzzle could be solved. This information is used to solve further puzzles. The victim "made 90 errors out of the 208 items on the test," a "very, very poor score." Dr. Walker also reviewed the victim's

performance on the LFFAS, a test to determine whether the victim was "competent to manage [her] own financial affairs," and her results were "terrible." While she was able to name money from sight, she could not add money, count out change, balance a checkbook, or write a check. Her results fell far below the first percentile, indicating "significant brain dysfunction" in this area. On the PAI, a comprehensive personality test, the victim answered the questions "in an open and honest kind of way." On the GSSII, a test that measures "how easily misled a person is" by using their own answers to suggest poor performance on the test to see if they choose to change their answers, the victim scored "well beyond the 99th percentile" in terms of suggestibility. The victim took the GCS as well, which measures how well a person gets along with others. On this test, the victim presented as "resistant to be overly compliant."

Dr. Walker also administered the YAI Verbal Informed Consent Toll (YAI) and the Social Sexual Awareness Scale – two tests "designed to measure the same thing." The tests measure whether the person has a "basic understanding of sexual matters." The victim scored "pretty well" on both tests, being able to describe sexual activity and other components of sex. Dr. Walker testified that she made some "mistakes" on the tests because the victim believed one could get a sexually transmitted disease (STD) by swimming in a pool or standing too close to someone with an STD. He further explained that the victim did not understand the mechanics "about the use of the pill, or IUD devices," and she had never seen a condom.

The Vineland II was administered to the victim's mother, in order to understand what occurs during the day-to-day life of the person being assessed. Based on this test and other assessments, Dr. Walker opined that the victim fell between the "two-year-old level and the eight-year-old level in terms of her ability to do things on a day-to-day basis."

Based on all the above tests combined, Dr. Walker concluded that the victim had Williams Syndrome and that she had "difficulty reasoning and thinking things through." He said the victim was "mildly mentally retarded" with "very serious" cognitive limitations. He said the victim's relationship with the Defendant was "a pathological one." He opined but for her disease, "none of this would have ever happened."

Asked his opinion whether the victim had the ability to appraise the nature of her conduct, Dr. Walker replied

In my opinion, her ability to make decisions about sex is very, very impaired. [The] victim doesn't understand the context in which sexual behaviors are supposed to occur. She doesn't understand that there are risks and benefits associated with sex. She doesn't understand that it's a process that has to be engaged in, in terms of making a decision about whether to have sex with someone. [The victim's] reasoning is very

- 17 -

simple. I'm in love with him. I've always been in love with him. We should be together forever and so I want to have sex with him.

Dr. Walker reviewed Dr. Brown's report. He testified that she did "many of the things that [he] did in the course of [his] evaluation." He testified that he performed additional testing and would not have been able to render an informed opinion based solely on the YAI test. He reiterated his opinion that the victim could not appreciate the nature of her sexual activity with the Defendant because "she doesn't have the ability to think and reason through things at a high enough level to come to what . . . most of us would consider a good decision."

On cross-examination, Dr. Walker agreed that whether the victim made a "good decision" was not the legal standard. He further acknowledged that he was not present during the majority of the tests given to the victim. He was present for and administered the MMSE, PVT, the Lowenstein, and the YAI and the Social Sexual Awareness Scale. He calculated the scores for the WAYI, The SSAT, the test for malingering, and the MMSE. He did not review the victim's prior medical records to determine whether she had in fact been diagnosed with Williams Syndrome. According to his report, the victim did not receive social security benefits for her disability. He agreed that the victim's verbal IQ was much higher than other parts of her IQ. Asked to give his opinion on whether the YAI Verbal Informed Consent Tool should be the sole test to determine whether a person was capable of consenting to sex, Dr. Walker said

[T]he better practice would be the comprehensive kind of evaluation that I did. The YAI's tool simply asks whether or not the person knows basic information about sexual activity. But you don't really gain any information from the test about [sic] the person makes decisions in general. You don't get any understanding of their emotional condition or situation. You don't get any information about how they process information or think at a high level about things."

He characterized the YAI as part of a puzzle, but not the only part. Dr. Walker's report, memorializing his conclusion, was admitted into evidence.

Doctor Kimberly Brown, a licensed forensic psychologist, testified on behalf of the Defendant. She held a Tennessee license in psychology with health services provider designation and was tendered as an expert in the area of forensic psychology. She explained that a forensic psychologist is someone who specializes in the union of the law and psychology. In formulating her report for this case, Dr. Brown reviewed outside information including the police reports, the indictment, and investigative reports. She also reviewed the videotape of the victim's forensic interview and the videotape interview of the Defendant. She reviewed emails and text messages the victim sent to the

- 18 -

Defendant, the letter from Dr. Cox, the psychological report from Dr. Pruitt, and the report from Dr. Walker.

Dr. Brown testified that she reviewed the victim's verbal IQ from Dr. Pruitt's report. She said that the fact that the victim's high verbal IQ was higher than her other test scores showed two things (1) that the overall score should not be combined because it is misleading; and (2) that her verbal abilities are "low average, but not significantly impaired, but they're definitely a strength for her." She reviewed the victim's video interview, and opined:

> [The victim] presented similar to the way she did today. She's poised. She's reflective. She understands the questions asked of her. She's responding appropriately. I thought her responses showed good detail.

> She also corrected the interviewer at times and was very concerned that the interviewer would get misleading impressions of whom [the Defendant] was. So she said things like, You know, I don't want you to judge him as a person. I don't know how you can judge him as a person. I don't know how you can determine what his intentions are just from this interview with me.

> . . . .

> So there was a level of kind of a sophistication and her reasoning about this that I saw in her interview with Kids Place. During the interview as well she talked about how they were involved in a relationship. How he never forced her to do anything. That everything that she did she did of her own accord.

During their interview, the victim told Dr. Brown that "she did not want to be there, but her mother wanted her to be there." Dr. Brown evaluated the victim for the purpose of determining if she was capable of giving consent to sexual activity with the Defendant. Her discussion with the victim's mother was limited to the logistics of determining the next appointment. She acknowledged that the victim correctly testified that her report erroneously reflected that the necklace the Defendant gave her was gold instead of silver. She discussed the circumstances of the offense with the victim and noted that her account was consistent with her trial testimony. She also took a social history of the victim and explained that the victim had three friends who were her age and others who were adult age. The victim discussed her love of music, singing, drawing, writing, and Elvis Presley impersonations. She also stressed the importance of religion in her life and the churches she attended.

Although Dr. Walker testified that the victim was unable to write complete sentences during his evaluation of her, Dr. Brown reviewed emails and texts from the victim and determined that she could, in fact, write a complete sentence. She said the victim was not on any form of government assistance, such as disability, and did not receive financial assistance outside of her family.

Dr. Brown explained that the test used to evaluate the victim was "a very unique type of assessment because it's a very specific question, someone's competency to consent to sex or the capacity to understand sexual conduct." She said this issue commonly arises, for example, in homes for individuals who have "mental retardation," and nursing homes for people with dementia. She utilized the YAI, a tool used by the National Institute for People with Disabilities to evaluate the victim, in addition to other measures, to determine whether an individual with mental disabilities/limitations is competent to consent to sex. She testified that "sexual activity is a fundamental instinct that people have. And that even people with mental retardation are capable of sexual activity, if they understand what is going on."

Dr. Brown disagreed with Dr. Walker's assessment of the YAI as a mechanistic test. She explained that it "actually goes into understanding a more subtle appreciation of sexual activity." Dr. Brown then provided the following examples of the questions on the YAI and the answers provided by the victim:

> If you wanted to have sex with someone what would you do? And, [the victim] said, Well, can you give me more details? She said, Well, I certainly wouldn't be forceful. I would give hints about it or say something. And then the next question was, Well if the person said, no, what would you do? And she said, Say that I wanted to make love to them or something. Then I said, Well, what if the person said, no? I repeated that. She said, Well, I guess no means no.
>
> The next question is, If someone wants to have sex with you and you don't, what [would you do]? And she said, Walk away. I said, What if you were in a relationship with that person? She said, Have a big discussion about things. I'm one of those people I wouldn't have done those things with [the Defendant] if I wasn't sure I was gonna get married to him.
>
> One of the questions asks about, How do a man and woman have a baby? So she responded, The penis goes in the vagina and all that stuff happens, and the sperm finds an egg and you don't become pregnant or you do. If you do the baby starts forming in the mother's womb.
>
> . . . .

. . . Another question is, When a man and a woman want to have sex but not make a baby what can they do?  She said, They could wear condoms, there's a patch, I think it's called, and birth control pills.  So she demonstrated some understanding that you can prevent pregnancy.

Another question is, Do you know of any diseases you can get from having sex with another person?  She said, STDs, another one is HIV.

And then there's kind of reasoning questions, here's one.  You're in a room watching television with another person who starts to play with his or her private parts, do you think that's okay?  Why or why not?  So she said, No.  I don't think people should be doing that in public.  I asked her why.  She said, That's something very personal and you shouldn't be sharing with a bunch of people in the room or even one person in the room.

Dr. Brown explained that the test is designed to determine an individual's ability to make a choice and the individual's ability to not be coerced or forced.  She said the test was to ensure that the individual's decision was voluntary.  In her view, most of the tests administered by Dr. Walker were "not relevant" or germane to the narrow issue of whether the victim had the ability to consent.  She analogized the process to evaluating an individual's ability to ride a bike.  "[She] could probably give them a lot of tests.  Like I could test their hand-eye coordination.  I could test their balance.  I could test the strength of their legs, for example.  But probably the easiest, the most direct way for me to know whether they could ride a bike is to have them get on a bike and see if they could ride it."  The tests applied by Dr. Walker, in her view, were "loose associations with the ability to give consent[.]"  Dr. Brown disagreed with Dr. Walker's conclusion that the victim was not competent to provide consent.  She opined that the victim was competent to consent, reasoning

[the victim] understands what sex is, she understands what can happen when you have sex with someone . . . .  She understands what type of sexual activity is legal versus illegal.  She understands that you can object to sex, not be forced to have sex even if you're in a married relationship.

So she just has to understand that nature of or the basic understanding of what sexual activity is and be able to make a choice about that.  She was very clear that this was her choice.  She was never forced into it.  In fact, in one of her writings she refers to herself as often having the upper hand in the relationship . . . .

Dr. Brown evaluated the victim in the context of the definition of consent in this case, whether the victim suffered from a mental disease or defect which rendered the victim temporarily or permanently incapable of appraising the nature of her conduct.  In

doing so, Dr. Brown stated that the question was not whether this was a good decision or healthy relationship for the victim but rather whether the victim was legally competent to consent to sex. Dr. Brown further testified that the victim's verbal abilities, which were most related to her ability to consent to sex, were low but not extremely impaired to render someone incapable of consent. In regard to whether the victim was "mildly mentally retarded," as noted by Dr. Walker, Dr. Brown disagreed but acknowledged that this issue was debatable. Significantly, Dr. Brown opined that "[I]n the end, it doesn't really matter whether she is mentally retarded or not because mentally retarded people can give consent to sex. The issue was can she give consent." In her expert opinion, Dr. Brown concluded that the victim was competent to consent to sex with the Defendant. Her report memorializing her conclusion was marked for identification and later admitted into evidence on re-direct after it was redacted.

On cross-examination, Dr. Brown was asked a series of questions pertaining to the questions asked by the interviewer during the forensic interview of the victim. She agreed that an individual could consent to sex and not know that they were being used. She also agreed that she evaluated the victim in February 2015, and the alleged offense occurred in 2012. Asked whether the victim's knowledge of sex could have increased in the three-year period, Dr. Brown said, "[i]t may have, but that's why [she] placed the importance on the [forensic interview in June 2013]." She further agreed that she did not administer any of the tests administered by Dr. Walker, other than the YAI. Dr. Brown then reaffirmed the questions provided by the test and answers given by the victim. She reiterated that she "[a]bsolutely . . . felt really confident" that the victim was able to appraise the nature of her own conduct at the time of the alleged offense. She said she did not find this case to be a close call at all.

She said that at the time of her evaluation of the victim she was familiar with Williams Syndrome and had done research on the condition. She said it was a very rare genetic disorder, and she had to learn about it. She agreed that consistent with Williams Syndrome the victim had neurocognitive abnormalities "especially the spacial [sic]" or her ability with numbers and math. Asked if she believed the victim was emotionally immature, Dr. Brown opined

> I think she is naïve and has been sheltered – she has limited understanding, I think, certainly of romantic relationships especially. She never dated or had a boyfriend before this. So I don't know if it's a combination of being sheltered and not having had those experiences, or if it's more having Williams Syndrome, or whether it's both that's cause those impairments and understanding social interactions. There were some limitations there.

At the conclusion of the trial, the jury found the Defendant guilty of rape. The trial court sentenced the Defendant to ten years and six months' incarceration. The

Defendant filed a motion for new trial. After a hearing, the trial court denied the motion. This timely appeal followed.

## ANALYSIS

**I. Limited Cross-Examination.** The Defendant contends that "the trial court erred in prohibiting trial counsel's cross-examination of Dr. James Walker about his suspension from the practice of forensic psychology." In response, the State recasts the Defendant's issue on appeal as whether "the trial court committed per se error by prohibiting him from asking Dr. Walker whether he was competent to render an opinion and whether he was 'using or suffering from the abuse of cocaine' when he evaluated the victim and testified at trial." The State then insists that the Defendant has waived this issue for failure to raise it before the trial court. While we agree that late in the argument section of the Defendant's brief, the Defendant conflates the two issues of the Defendant's right to cross-examine Dr. Walker with whether Dr. Walker was competent to render an expert opinion, the record shows that the Defendant (1) sought only to impeach the expert witness on cross-examination; and (2) this issue was fully explored at the State's motion in limine for purposes of cross-examination. Finally, the trial court specifically ruled upon the extent to which the Defendant would be permitted to engage in cross-examination of Dr. Walker regarding the status of his license in its order granting the State's motion. Accordingly, the issue is properly preserved for our review.

Here, the Defendant argues that he should have been permitted to cross-examine the State's expert witness and ask whether Dr. Walker's license had been suspended previously and on probationary status when he evaluated the victim in this case. On this question, the trial court properly found that the evidence concerning the suspension of the State's expert witness's license was relevant to rebut the expert's credibility as a witness. The trial court nevertheless excluded this testimony upon finding the probative value was outweighed by its prejudicial effect. Tenn. R. Evid. 402, 403. The theory here, as argued by the State, was twofold: (1) that allowing the jury to hear only about the expert's suspended license, without offering reasons why, would allow rampant speculation and place undue emphasis on a collateral matter; and/or (2) that permitting the jury to hear the reasons for the suspension, in this case drug abuse, would expose the jury to matters unrelated to the truthfulness of the witness in violation of Rule 608 of the Tennessee Rules of Evidence. For the reasons that follow, we agree with the Defendant, and conclude that the trial court improperly excluded the probationary status of the State's expert witness.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. See U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996). A component part of this constitutional protection is the right to establish bias or to otherwise impeach the credibility of a witness. State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006); State v.

Sayles, 49 S.W.3d 275, 279 (Tenn. 2001); State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993). The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court. State v. Reid, 213 S.W.3d 792, 839 (Tenn. 2006); Rice, 184 S.W.3d at 670. When the defendant's right to cross-examine witnesses is unreasonably restricted, the trial court abuses its discretion. Reid, 213 S.W.3d at 839; Rice, 184 S.W.3d at 670; Davis v. State, 212 S.W.2d 374, 375 (Tenn. 1948).

The admissibility of evidence rests within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

The Tennessee Supreme Court has also held that the exclusion of evidence can violate a defendant's due process rights when it prevents a defendant from presenting a defense:

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. Principles of due process require

- 24 -

that a defendant in a criminal trial have the right to present a defense and to offer testimony. See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). In Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed 2d 1019 (1967) the United State Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. 388 U.S. at 19, 87 S. Ct. 1920.

State v. Flood, 219 S.W.3d 307, 315-16 (Tenn. 2007). The court further stated that the following factors should be considered when determining whether the exclusion of evidence results in a due process violation: "(1)[w]hether the excluded evidence is critical to the defense; (2) [w]hether the evidence bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the evidence is substantially important." Flood, 219 S.W.3d at 316 (citing Brown, 29 S.W.3d at 434-35; Rice, 184 S.W.3d at 673; State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

In light of the above authority, we conclude that limiting either party's ability to cross-examine the expert in this case was error. See Sneed v. Stovall, 22 S.W.3d 277, 280-82 (Tenn. Ct. App. 1999) (evidence bearing on an expert's professional expertise, such as the person's education, training, licensing, and experience, is admissible); Joe M. Gilbert v. State, No. M2012-01440-CCA-R3-PC, 2013 WL 152264, at *6 (Tenn. Crim. App. Jan. 15, 2013) (evidence of police officer's alleged unprofessional conduct could serve to impeach the officers credibility), perm. app. denied (Tenn. June 12, 2013); see also Marc D. Ginsberg, Good Medicine/Bad Medicine and the Law of Evidence: Is There A Role for Proof of Character, Propensity, or Prior Bad Conduct in Medical Negligence Litigation?, 63 S.C. L. Rev. 367, 398 n.265 (2011) (collection of cases reversing and remanding for new trial based on trial court's error in refusing to permit defendant's cross-examination of status of expert witness's professional license).

The State's position supporting exclusion of the question is unpersuasive for the following reasons. Rule 403 of the Tennessee Rules of Evidence is narrow in its application and is a rule of admissibility that places a heavy burden on the party seeking to exclude evidence. See State v. James, 81 S.W.3d 751, 757 (Tenn. 2002) (citing Roy v. Diamond, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999)). "[E]xcluding relevant evidence

- 25 -

under [this rule] is an extraordinary remedy that should be used sparingly, . . . and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) ("[A] trial court should not exclude evidence under Tenn. R. Evid. 403 when the balance between the probative worth of the evidence and the countervailing factors is fairly debatable.") (citations omitted); State v. Saylor, 117 S.W.3d 239, 249 (Tenn. 2003), holding modified by State v. Turner, 305 S.W.3d 508 (Tenn. 2010). More to the point, Tennessee courts have previously held that cross-examination of an expert concerning whether the expert's license had been previously suspended, as argued by the Defendant, is admissible and proper. Sneed, 22 S.W.3d at 280-82; see also Wischmeyer v. Schanz, 536 N.W.2d 760, 764-66 (Mich. 1995); Kostel v. Schwartz, 756 N.W.2d 363, 370 (S.D. 2008) ("inquiry into an expert's *alleged* mistakes or connection to *unrelated* adverse claims do not impact on his credibility or character for truthfulness [under Rule 608]. However, . . . evidence contrary to the representation of the witness's expertise in the field for which he offers his opinion at bar *is relevant to his competency,* does impact *credibility* and therefore, is appropriate inquiry.").

It is within the sole province of the jury to evaluate witness credibility. By granting the State's pretrial motion in limine to exclude testimony concerning the status of the expert's professional license, the trial court circumvented this function. White, 21 S.W.3d at 227 (noting that trial courts must be careful not to usurp the function of the jury when undergoing Rule 402 & 403 analysis). Had the limited question been permitted, the jury would have been able to weigh the State's expert witness's credentials, wholly and truthfully, in relation to the opposing expert offered by the Defendant during trial. The Tennessee Board of Psychology, the appropriate regulating authority, saw fit to suspend this doctor's license and place him on probation. His license was in probationary status at the time of his evaluation of the victim and at the time of trial. Excluding deficiencies in the expert's qualifications, as the trial court did here, effectively shielded the expert from the purpose of cross-examination, which is to test the reliability of an expert's opinion.

Disclosure to the jury that the State's expert witness's license had been previously suspended and was in fact in probationary status at the time he evaluated the victim was indeed prejudicial to the State's case. However, prejudice becomes unfair only when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (citing M. Graham, Handbook of Federal Evidence 182-83 (2d ed.1986)); see also Wischmeyer, 536 N.W.2d at 766 (noting that evidence does not present a danger of *unfair* prejudice unless it threatens the fundamental goals of [TRE 401 and 403]: accuracy and fairness) (citing Gold, Federal Rule of Evidence 403: Observations on the nature of unfairly prejudicial evidence, 58 Wash. L. Rev. 497 (1983)). The primary purpose of informing the jury that the State's expert witness's license had been suspended at the time he performed the evaluation bears on the expert's credibility and is

not contrary to the underlying goals of Rules 401 and 403. Under these circumstances, we conclude that the State failed to carry its burden in establishing exclusion of the expert's license suspension.

Moreover, in granting the State's motion in limine, we are compelled to note that the trial court failed to engage in the appropriate weighing analysis under Rule 403. The trial court determined that "to allow cross-examination of [the expert] with the simple question of, [']Is your license presently probated or subject to probation and or did you enter into a consent order relative to unprofessional conduct et cetera,['] would be confusing as to the issues . . . [and] the danger of unfair prejudice is significant." The court reasoned further that because the expert was no longer engaged in the misconduct which led to the suspension that it would be misleading to the jury to inquire as to the current status of his license. However, Rule 403 required the trial court to weigh the probative value of the *license suspension, not the precipitating acts of misconduct*, against the countervailing factors identified in Rule 403. In failing to do so, the trial court erred.

Finally, the State's position is somewhat disingenuous because while this case was pending, Earnest Costosteno Woodley v. State, No. M2018-00217-CCA-R3-CD, was appealed to this court.[5] Interestingly, in that case, the defendant offered the expert testimony of the same witness offered by the State in Ziegler, the case at bar. In two separate trials, the State in Woodley argued for and received permission to cross-examine this expert witness, at length, regarding the suspension of his license as well as the specific instances of conduct which led to it. The defendant appealed, arguing that the trial court erred in allowing the State to cross-examine the expert witness regarding the suspension of his license. In their brief to this court, the State candidly acknowledged the inconsistent position taken in both cases; however, they maintained no abuse of discretion by either trial court. Although the State attempted to distinguish Zeigler in Woodley, we fail to see any meaningful difference. We cannot in good conscious condone a position or rule that changes based solely on how or when it benefits a party. Simply put, resolution of this issue cannot depend on whose ox gets gored. Accordingly, we agree with the position taken by the State in Woodley and conclude that a limited inquiry into the status of an expert witness's professional license is admissible to impeach the credibility of the witness.

We must now determine the effect, if any, of the trial court's error in prohibiting the Defendant from cross-examining the State's expert witness regarding the suspension of his license and probationary status.

---

[5] We presume this case to be one of the two cases Dr. Walker referenced at the motion in limine hearing.

**II. Interference with Right to Present a Defense.** The Defendant next argues that the trial court's decision to limit cross-examination of the expert witness effectively interfered with his right to present a defense. Here, the Defendant argues that the trial court's error undermined his ability to present a defense, lessened the State's burden of proof, and violated his right to a fair trial under the Sixth Amendment's confrontation clause. The right to effective cross-examination is subject to harmless error review. Delaware v. Van Arsdall, 475 U.S. 673, 680-81 (1986); Howell, 868 S.W.2d at 252-53; Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999). A number of factors are relevant in determining whether the improper denial of a defendant's opportunity to impeach a witness is harmless including the "importance of the witness' testimony in the prosecution's case, the cumulative nature of the testimony, the presence or abuse of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." Howell, 868 S.W.2d at 253 (quoting Van Arsdall, 475 U.S. at 684-85).

Although there was other lay testimony concerning the victim's behavior generally, the proof as to her inability to consent was far from overwhelming. The victim was competent to testify and explained, at length, her relationship with the Defendant and that she was not forced to engage in fellatio with him. A fellow church member testified that he did not observe the victim to have any obvious mental deficiencies. While another expert in psychology opined that the victim could not consent, her opinion was based solely on clinical interviews with the victim. The expert witness in question was tendered as an expert in both neuropsychology and forensic psychology. He subjected the victim to a battery of tests. Even though the victim passed the two tests that were specifically designed to determine whether individuals with intellectual disabilities can consent to sexual intercourse, the State's expert witness concluded that the victim was not competent to consent. The Defendant's expert witness utilized the same two tests that were specifically designed to determine consent as the State's expert witness and reached the same conclusion (i.e. that the victim was capable of consent). Because the proof from both experts was largely the same as to the victim's ability to consent, we are unable to conclude that the trial court's error in precluding the Defendant from cross-examining the State's key witness did not impact the verdict in this case. Accordingly, we are constrained to reverse the judgment of the trial court and remand for new trial.

We review the Defendant's final issue, whether the sentence imposed by the trial court was excessive, in the event of further appellate review.

**III. Excessive Sentence.** Finally, the Defendant argues that his sentence is excessive because the trial court "did not give due weight to certain mitigating factors and thus, failed to follow the appropriate sentencing guidelines outlined in T.C.A. 40-35-101 . . . ." Additionally, the Defendant complains that the length of his sentence, at ten and one-half years, prohibits him from being eligible for an alternative sentence. The

State counters arguing that the trial court properly sentenced the Defendant. We agree with the State.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012); State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." Bise, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. Tenn. Code Ann. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210(b); see also Bise, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706.

At the lengthy sentencing hearing, the victim testified to "other sexual incidents" that occurred between her and the Defendant. According to the victim, she kissed the Defendant, performed oral sex on the Defendant at least twice, and held hands with the

Defendant. In addition, the Defendant performed oral sex on her once and touched her private parts over her shorts.

The victim read from a lengthy statement in which she described her inability to sleep, eat, or drink as a result of her separation from the Defendant. The victim expressed her displeasure with the Defendant's refusal to tell the truth about their relationship to his wife and adult daughters, claiming that "he wanted to marry [her]." The victim utilized multiple metaphors to describe her relationship with the Defendant, claiming that she and the Defendant "connected like a branch connects to a tree . . . emotionally, mentally and on so many other levels;" comparing herself to a calf being weaned from its mother; and likening their relationship to a golf match. She explained that they "cared deeply about each other." The victim concluded that she knew the Defendant "still love[d] [her]," and even asked the trial court for visitation with the Defendant if he was incarcerated.

The victim's mother testified that the Defendant was like a "grandfather" to the victim. She testified that she had cautioned the Defendant that the victim had a crush on him and that he needed to tell her that it was not "going anywhere." The victim's mother "trusted" the Defendant because he was their "friend" and "pastor." She testified that the Defendant's actions changed their family forever. Joy Hopper, a friend of the victim's mother and the victim, confirmed that the Defendant's actions had an overwhelmingly deleterious effect on the victim and her family.

Dennis Deblock testified on behalf of the Defendant. Deblock knew the Defendant because they had "officiat[ed] various sports for the State of Tennessee." Deblock "enjoyed working with" the Defendant and "[a]lways knew that he was a good person." DeBlock explained that the Defendant was a supervisor with TSSAA (Tennessee Secondary School Athletic Association) and was "well-respected" within that community. Deblock was "very upset" when he heard about the allegations against the Defendant but "asked [the Defendant] if he could be [at the sentencing hearing]" to testify on his behalf. Deblock acknowledged that rape was a serious crime but did not think that a prison sentence was appropriate for the Defendant.

Billy Lemastus met the Defendant around 1993 when the Defendant became caretaker of Camp Christian in Dickson. Lemastus also acted as a sports official with the Defendant at various types of sporting events including basketball. He described the Defendant as a hard-working man and a Christian.

Dr. Kenney Oosting met the Defendant in approximately 1992 at Camp Christian and eventually attended Central Christian Church in Columbia where the Defendant acted as pastor. Dr. Oosting was on the board of the church when the Defendant was fired from Central Christian Church. Dr. Oosting explained that the Defendant was not fired based on the incident at issue at trial but rather because there was a group of people on

the board that did not like the Defendant. Dr. Oosting continued to attend the Way Church that the Defendant formed after leaving Central Christian Church. He was "shocked" when the Defendant informed him about his relationship with the victim. Dr. Oosting "thought [the relationship with the victim] was so out of character" for the Defendant.

The State sought the application of multiple enhancement factors. After reviewing the proof and the sentencing act, the trial court declined to apply enhancement factor (4), the victim was particularly vulnerable because of age or physical or mental disability, because it was a factor that the jury could have considered at trial. Tenn. Code Ann. § 40-35-114(4). The court applied enhancement factor (7), the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(7). The trial court noted the Defendant's effort to "orchestrate[] the absence of other individuals, including his daughter" when taking the victim to an isolated area. The trial court put "fairly significant weight" on this factor. The trial court also applied enhancement factor (14), that the Defendant abused a position of public or private trust or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense. Tenn. Code Ann. § 40-35-114(14). The Defendant's position as pastor and his awareness of the victim's condition and her feelings toward the Defendant contributed to the trial court's application of this factor. Despite the Defendant's insistence that multiple mitigating factors applied, the trial court only utilized mitigating factor (1), finding that the criminal conduct neither caused nor threatened serious bodily injury, despite noting the "magnificent" effect of the Defendant's actions on the victim and her family. Tenn. Code Ann. § 40-35-113(1).

As a Range I, standard offender sentenced to a class B felony, the Defendant was facing a sentence of eight to twelve years. Tenn. Code Ann. §§ 39-13-503(b); 40-35-112(a)(2). After making lengthy findings, the trial court started with the minimum sentence of eight years and enhanced the sentence one year on the basis of enhancement factor (7) and two years on the basis of enhancement factor (14), bringing the sentence to eleven years. The trial court then reduced the sentence by one-half a year on the basis of the lone mitigating factor. As a result of the application of enhancing and mitigating factors, the trial court sentenced the Defendant to a sentence of ten years and six months. The trial court denied placement on Community Corrections and noted that the Defendant, sentenced to a sentence longer than ten years, was not eligible for probation. See Tenn. Code Ann. § 40-35-303(a).

Because the Defendant was sentenced to a within-range sentence, the trial court's decision is entitled to a presumption of correctness. Bise, 380 S.W.3d at 709-10. The record before this court shows that the trial court thoroughly and completely applied the statutory sentencing principles. The evidence in the record supports the trial court's application of the enhancement and mitigating factors. Accordingly, the trial court did not abuse its discretion in sentencing the Defendant.

- 31 -

## CONCLUSION

Based on the foregoing reasoning and analysis, we reverse the Defendant's conviction of rape and remand this matter for a new trial.

_____
CAMILLE R. MCMULLEN, JUDGE